## Foering et al. v. City of Bethlehem et al.

*Fox & Fox, George R. Booth,* and *Herbert J. Hertzog,* for plaintiff.
*Daniel L. McCarthy,* for defendants.

STEWART, P. J., November 3, 1933.—The following is a summary of the facts: Certain taxpayers of the City of Bethlehem filed a bill alleging that it passed an ordinance to obtain the assent of the electors to an increase in the indebtedness of the city in the sum of $125,000 for the construction of a municipal power and light plant; that 3 days did not intervene between the introduction of the ordinance and its final passage; that the notice of election contained a statement of the city's gross debt instead of its net debt; and that it had not deducted therefrom certain water bonds, moneys in the treasury, outstanding debts and revenues applicable within 1 year for the payment of the same; that the notice

included an amount by which the city had already exceeded its councilmanic borrowing capacity, and that the percentages given therein were not accurate; and that the description of the purposes for which the money is to be used is misleading. The court found the facts substantially as set out in the bill.

## Discussion

This is an application for a preliminary injunction after notice given to the defendants. The hearing was fixed for October 27, 1933, and we heard testimony of witnesses produced by both parties. After considering the case, we think it is one free from any difficulty. The foundation for the proposed increase of indebtedness was the ordinance no. 677, which was introduced into city council on October 2, 1933, and passed first reading on that day. The city council passed the ordinance finally on October 5, 1933. Section 1012 of The Third Class City Law of June 23, 1931, P. L. 932, provides: "Every bill shall be read at length. No bill shall be passed finally on the same day on which it was introduced. At least three days shall intervene before its final passage." The important words are "three days shall intervene." The argument as to the meaning of these words, and as to the nonapplicability of the Act of June 20, 1883, P. L. 136, is conclusive. The learned counsel for the city cites the only case which sustains his contention, Rich v. Boguszinsky, 88 Pa. Superior Ct. 586. It is out of line, and we agree with what Judge Hicks said about that case in Derringe v. Walton et al., 13 D. & C. 82. The syllabus of the latter case is: "When so many days 'at least' are given to do an act or 'not less' than so many days must intervene before an act is done, both the terminal days are excluded, and this rule has not been changed by the Act of June 20, 1883, P. L. 136." The opinion contains an extended discussion of the subject. In Imes v. Roberts, 25 Dist. R. 380, the syllabus is: "Under the Act of June 13, 1836, P. L. (1835-36) 568, in all counties, except Philadelphia and Allegheny, ten days must intervene between the date of the issuance of a writ of summons and the return-day.

"The Act of June 20, 1883, P. L. 136, which provides that in computing the time fixed for any period the first day is to be excluded and the last included, does not apply." In Manufacturers Finance Co. v. Pope-Marmon Co., 11 D. & C. 170, the syllabus is: "The word 'between,' when used in speaking of the period of time between two certain days, generally excludes the days designated as the commencement and termination of such period." The matter is also fully discussed in Gregg's Estate, 213 Pa. 260. At page 263 Mr. Justice Brown said: " 'At least one calendar month' must elapse between the execution of a will containing a charitable bequest and the death of the testator, if the bequest is to be valid. The meaning of the words 'at least' is 'in the smallest or lowest degree; at the lowest estimate, or at the smallest concession or claim; at the smallest number:' 4 Cyc. of Law & Proc., 366. In declaring that 'at least one calendar month' must elapse between the execution of a will containing a charitable bequest and the death of the testator, the manifest meaning of the statute is that such a month must fully elapse between the dates of the two events." Again he said (p. 264): " 'When so many "clear days" or so many days "at least" are given to do an act, or "not less than" so many days must intervene, both the terminal days are excluded:' Endlich on Interpretation of Statutes, sec. 391. . . .

" 'As the meaning of the words of the act under consideration is so plain, we do not deem it necessary to apply the rule as to the computation of time, nor refer to the Act of June 20, 1883, P. L. 136, declaratory of it, requiring the exclusion of the day on which an act is done." It is, in our judgment, absolutely certain that these proceedings will have to stop.

Another patent error is in the published notice of the election. That notice must be given for at least 30 days prior to the election by weekly advertisements in the newspapers, not exceeding three. We are unable to determine on just what date the first notice was published, but it must have been October 6, 1933. On that date, and on the 13th and on the 20th the admittedly mistaken percentage was published. On the 27th it was corrected, and we presume that it will appear in its corrected form on November 3rd. This was an unfortunate clerical mistake, and the witness frankly admitted it, but it is a mistake that cannot be overlooked. For three issues, from the city's point of view, this notice was incorrect and misleading. In Graham et al. v. City of Lebanon, 240 Pa. 337, the syllabus is: "Municipal bonds representing an increase of indebtedness beyond two per cent. of the assessed valuation of taxable property are valid only as the provisions of the Act of April 20, 1874, P. L. 65, are complied with, and publication of notice of an election under the act in three daily newspapers, not continuously in any one, but from time to time in each, during the required period, in such manner that twelve days elapsed during which no publication of the notice appeared, does not satisfy the statutory requirement that 'thirty days' notice shall be given by weekly advertisement.' " For these two reasons alone we would have to grant this injunction, but there are other matters which are of equal importance, and as the case involves a public matter, it is proper for us to refer to them.

The matter of the increase of municipal indebtedness is one that calls for the exercise of a highly specialized investigation into the provisions of the law and into the accounts of the city concerned. Eminent lawyers specialize in these matters, and almost every municipal issue comes under their supervision either at the inception of the proceedings in councils or after the bonds are issued. The limited time at our disposal does not enable us to more than briefly refer to the subjects that we think ought to receive attention before another attempt is made to increase the debt of the defendant city. These defects are as serious as those discussed above, and are equally fatal to the present proceeding. Section 3 of the Act of April 20, 1874, P. L. 65, requires that the notice contain "a statement of the amount of the last assessed valuation, of the amount of the existing debt, of the amount and percentage of the proposed increase, and of the purposes for which the indebtedness is to be increased." Section 5 provides: "The word 'indebtedness,' used in this act, shall be deemed, held and taken to include all and all manner of debt, as well floating as funded, of the said municipality; and the net amount of such indebtedness shall be ascertained by deducting from the gross amount thereof, the moneys in the treasury, all outstanding solvent debts, and all revenues applicable within one year to the payment of the same." The notice itself gives the last assessed valuation as $70,345,922.00, which it is agreed is the correct figure. The amount of the debt is given as $4,111,116.46. This is not in accordance with section 5 above and with the decisions of the Supreme Court. Mayor Pfeifle and Mr. Frantz testified how the last amount was made up. The latter witness gave the figures which we have incorporated in the tenth finding of fact, making up the total debt in the published notice. No attempt was made to follow the act of assembly. Mayor Pfeifle testified:

"Q. So it is apparent, is it not, that from the election notice the voters cannot tell just what the net existing debt of the city is, can they? A. They know it isn't any more.

"Q. But they don't know how low it is, do they? A. We gave them the outside figure.

"Q. You gave them the maximum figure? A. Yes, sir.

"Q. And gave them the benefit of the doubt, knowing at the time it was not the exact fact as to the net existing debt? A. That matter I left entirely up to our city solicitor.

"Q. But you knew at the time yourself that it was an outside figure, that it wasn't the net existing debt? A. Not the net existing debt is correct."

It is perfectly apparent that the mayor thought that no harm could be done by inserting the gross debt of the city instead of following the provisions of the act. The learned counsel for the city in his brief earnestly contends that gross indebtedness is the amount which should be set forth, and his argument is that the plaintiffs are moved by some other influence rather than the good of the citizens of Bethlehem in their contention that the net indebtedness should be set forth. The answer to his contention is that so far as the evidence shows, the plaintiffs are the only interested parties in this case. It was attempted to be shown on cross-examination that they were merely representing Pennsylvania Power & Light Company, but that attempt failed. We cannot assume that there is any other party, and if there were another party it would make no difference. From the point of view that the gross indebtedness would be a fairer figure, much might be said, but the act of assembly provides otherwise. Counsel for the city cites Barr et al. v. City of Philadelphia et al., 191 Pa. 438. In that case there were 18 purposes stated in the ordinance. The ballot had on it "Increase the debt" on the outside, and within "No increase of debt", "Debt may be increased". It was held that it was not necessary to vote separately on the 18 propositions in the ordinance. The case is unlike the present one. He also cites Major v. Aldan Borough, 209 Pa. 247. That case followed Barr et al. v. Philadelphia et al., supra, and it was assumed in the case that the ordinance and the notice were sufficiently specific, but it was not so stated on the ballot. Mr. Justice Brown said (p. 251): "When, by an ordinance, the municipal authorities direct, in conformity to the constitutional requirement, the submission to a popular vote of the question of the increase of the indebtedness, the purpose for increasing it is distinctly set forth, and, in the notice of the election, this purpose again appears, and on his ticket the elector finds a brief statement of it and the amount of the increase, the borough council cannot, after the increase is authorized by a popular vote, so cast, divert the money from the purpose for which they, in the first instance, declared it was to be used." In other words, it is the ordinance and the notice that are important, not the ballot. However, the law is so plain that the information given in the election notice must conform to the act that it is hardly necessary to cite the authorities. The published figure, $4,111,116.46, is evidently made up of gross bonded indebtedness, $3,616,900.00, plus $494,216.46, the items on page 2 of exhibit 1. From that total should be deducted the sinking fund and the other deductions found on page 2 of exhibit 1, which would leave the net indebtedness on October 5, 1933, $2,040,357.35. In Brooke et al. v. City of Philadelphia et al., 162 Pa. 123, will be found an elaborate discussion as to the deduction of the amounts held in the sinking fund. The syllabus of the case is: "Under section 8, article 9 of the constitution, which declares that 'the debt of any city shall never exceed seven per cent of the assessed value of the property therein,' the debt of a city is properly ascertained by subtracting from its total indebtedness the amount of the certificates of the funded debt of the city held in the sinking fund." See also Bruce et al. v. Pittsburg et al., 166 Pa. 152, and Schuldice v. Pittsburg, 234 Pa. 90. Upon the question of what are solvent debts, see McGuire v. Philadelphia (No. 1), 245 Pa. 287, and McGuire v. Philadelphia (No. 2), 245 Pa. 307, where

the court discussed both the debt question and the contents of the notice which we shall discuss hereafter. The syllabus of the latter case is: "The statutory requirement relating to public notice to be given by advertisement of an election to be held for the purpose of submitting to electors the question of a proposed increase of municipal indebtedness, is that it shall contain, inter alia, 'the amount of the existing debt' of the municipality. This provision is to enable the elector to act not only intelligently but prudently in casting his ballot for or against a proposed increase of the indebtedness of his municipality, and it is mandatory upon the public authorities.

"The corporate authorities of the City of Philadelphia, in giving public notice of an election to be held for the purpose of authorizing an increase of indebtedness, deducted from the gross indebtedness of the city a sum which had been assumed by a school district coincident with the city, and published only the balance of the debt after such deduction. *Held*, this deduction was unlawfully made, and, therefore, the publication of the amount of the indebtedness was inaccurate, and an injunction was issued restraining the election." See also upon the subject of debts owing the city and unliquidated and disputed claims, Schuldice v. City of Pittsburgh, 251 Pa. 28, and Halpin et al. v. Rochester Borough, 281 Pa. 109. This case is cited by the learned counsel for the city as a leading case, supporting his view, and he quotes the opinion of Mr. Justice Sadler to the effect of the deduction of outstanding collectible revenues. The learned justice did not say that it was proper to set forth the entire debt, but that the deducion made in that case was proper. There is nothing in the case which in any way detracts from what we have said above. In fact, the first syllabus is a correct statement of the law, as follows: "The notice published for the information of the electors as to an increase of municipal debt must contain the details legally required." Among the items deducted on page 2 of exhibit 1, were waterworks bonds, $1,071,324.06. The Act of June 5, 1915, P. L. 846, was passed to put in effect section 15 of article IX of the Constitution. It provides that bonds issued for the construction or acquisition of waterworks shall not be considered as a debt of the municipality within the meaning of section 8 of article IX of the Constitution, provided the net revenue derived from said property for a period of 5 years shall have been sufficient to pay interest and sinking fund charges during said period upon said obligations. While no evidence was adduced to show that the said revenue for 5 years was sufficient to pay the charges, yet ordinance 628 was introduced in evidence, and it makes that declaration, and while it cannot be said that the court could take judical notice of what appeared in no. 2, February term, 1933, nevertheless we are in the bounds of truth, as appeared in that case, when we assume that the revenue for 5 years was greater than the interest and sinking fund charges. That is a proper deduction.

It is also contended that the city should have deducted its preconstitutional debt. In no. 2, February term, 1933, it was assumed that that was a proper deduction, and the only matter before the court was as to the amount. We held that it was $61,320.16. In Hirt v. City of Erie, 200 Pa. 223, the syllabus is: "Bonds issued for the purpose of refunding an indebtedness incurred prior to January 1, 1874, are not to be considered a new debt, in ascertaining the constitutional limit of two per cent of the assessed valuation of property, beyond which the debt cannot be increased except by a vote of the people." In Schuldice v. Pittsburg, 234 Pa. 90, the syllabus is: "In computing the borrowing capacity of two per centum not requiring the assent of the electors all indebtedness existing prior to the adoption of the state constitution of 1874 should be excluded, and this exclusion applies to refunding bonds issued since that time to take the place of bonds outstanding when the constitution went into effect and also to both

bonds and cash paid into municipal sinking funds for specific purposes under statutory authority." See also Halpin et al. v. Rochester Borough, supra. It is also contended that the city should deduct the excess from the councilmanic borrowing capacity, and in the brief it is said: "Until the obligations with respect to this excess over the councilmanic borrowing capacity are determined, either by ratification by the electorate or otherwise, the city authorities are without warrant in law in including such excess in a proper determination of the debt of the city." In no. 2, February term, 1933, we found that when the city entered into the three contracts referred to in that suit, it increased the debt of the city above the councilmanic debt limit, but we did not find the exact amount, nor could it be found in the present suit as the record now stands. The last paragraph of the bill, paragraph 27, is as follows: "That equity and good conscience, as well as that measure of fair dealing and common honesty which the law imposes upon municipal authorities, require that the obligation of the city with respect to the debts already incurred by the city council in excess of the limitation placed upon such debts by law, should be determined before considering the question of incurring new and additional indebtedness in connection with a scheme or project which may ultimately absorb the entire remaining, available borrowing capacity of the city." The prayer of the bill is that the defendants be restrained "from holding any election or taking any steps preliminary to the holding of any election for the approval of an increase of the indebtedness, until the obligation of the City of Bethlehem in excess of the constitutional limit placed upon its councilmanic indebtedness, without approval of the electors, has been determined." That prayer is, of course, predicated upon a disposition of the matters in the paragraph referred to. In our judgment, they could not be passed on at the present time. If another election is proposed, it is a serious matter and should receive careful study, but we do not think it is before us at the present time, especially in view of the other reasons given herein.

There is no use in discussing the matter of percentages as given in the notice. Two of them are rendered incorrect by what we have said above.

The last matter that we feel it necessary to discuss is, does the notice correctly state "the purposes for which the indebtedness is to be increased", as required by the act? The notice states: "The purposes for which the indebtedness is to be increased are for the construction, erection, and acquisition of a municipal power and light plant for the City of Bethlehem." We have already referred to the importance of the notice, and given the syllabus in McGuire v. Philadelphia, supra. In Raff v. Philadelphia et al., 256 Pa. 312, the syllabus is: "The words of the notice of an election on the question of the increase of a municipal indebtedness are to be understood by the electors in their popular, natural and ordinary meaning." In the opinion, Mr. Justice Brown, referring to the fact that the increase was advertised to be for $1,520,000 for the erection of a convention hall, whereas the cost was $700,000 more, said (p. 317): "This is a palpable breach of faith with the electors. They have a right to insist that what the city authorities so clearly gave them to understand was to be the cost of the hall when they cast their ballots in favor of the increase of the city indebtedness for that purpose, shall not now be ignored by those authorities, for who can say that they would have voted for the increases if they had known the convention hall was to cost hundreds of thousands of dollars more than the sum indicated in the ordinances and in the notices of the elections held in pursuance of them?" In Wolff Chemical Co. v. Philadelphia, 217 Pa. 215, 225, the Supreme Court said: "It is one thing to present to a voter a proposition to increase an indebtedness for the purpose of continuing or completing a municipal improve-

ment already in progress, and quite another thing to ask him to increase the debt of the city for the purpose of inaugurating a public improvement which will result in the expenditure of large sums of money. For obvious reasons, he might and probably would favor the first proposition, but he might have a great hesitancy in supporting the latter. . . . In casting his vote for or against the proposition, he is controlled by the purpose of the proposed increase as stated in the ballot furnished him by the city itself." What is the municipal power to be used for? What sort of light is to be supplied? Is it gas or electric? Is the plant for the supply of power and light to the public generally as customers, or is it to be confined to supplying the City of Bethlehem for municipal purposes only? Is the present intention to install a plant and to generate electric power and light, and to build a line to connect the plant with the city-owned lighting standards, etc., comprising the boulevard system and the hill-to-hill bridge? Is this proposed increase of indebtedness to be used to supply substantially the same things that appeared in no. 2, February term, 1933? Mayor Pfeifle testified that it was the first unit in a system which might be subsequently enlarged. He admitted that he was in favor of selling light to the public. Of course that is only his individual opinion and could not bind the city. Whatever may be the purposes of this $125,000 increase, why not state it in the ordinance and notice?

We did not permit the plaintiffs to show how much it would cost the city to build a plant sufficient to supply light to the public. It seemed to us immaterial, and it is so unless the amount of the cost would in itself furnish an argument showing how misleading this notice is; but where the purposes of increasing the debt were so meagerly stated as in the present case it would necessarily mislead and deceive the voters, especially in view of the admitted fact that this question has been a burning issue for some time in the City of Bethlehem. Voters are entitled to have accurate information upon any question submitted to them. The act of assembly says so, and the courts have uniformly refused to countenance any omissions, whether made intentionally or accidentally.

Other questions were discussed in the argument, but we are of opinion that sufficient reasons have been given to show that these proceedings must be enjoined.

### Decree

And now, November 3, 1933, this cause came on to be heard at this term, and upon consideration thereof it is ordered, adjudged, and decreed that a preliminary injunction issue as prayed for, restraining the City of Bethlehem, Robert Pfeifle, mayor, and Charles H. Groman, Thomas W. Scott, Ario Wear, Fred C. Kline, councilmen, Robert L. Fox, city engineer, Victor E. Tice, city clerk, J. Harry Kresge, city controller, Earl H. Getter, city treasurer, The County of Northampton, Charles A. Bachman, Robert E. Ritter, John Stiles, county commissioners, The County of Lehigh, J. Peter Grim, Fred Waidelich, Jonas Ackerman, county commissioners, and each of them, from submitting to the electors of the City of Bethlehem at the election to be held on November 7, 1933, the question of the increase in the indebtedness of the city in the amount of $125,000 for the construction, erection, and acquisition of a municipal power and light plant for the City of Bethlehem, more particularly referred to in exhibits A and B of the bill; and from taking any steps to carry out the provisions of the city ordinances, and from increasing the debt of the City of Bethlehem as therein provided for. The said injunction to continue until final hearing of the matters complained of in the bill; bond in the sum of $1,000 to be approved by the court before the injunction issues.

From Henry D. Maxwell, Easton, Pa.